**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Esurance Property & Casualty Insurance Company,<br><br>Plaintiff,<br><br>v.<br><br>Ronisha Antone, et al.,<br><br>Defendants. | No. CV-23-00396-TUC-JGZ<br><br>**Order Re: Motion for Summary Judgment** |

Pending before the Court is Plaintiff Esurance Property & Casualty Insurance Company's Motion for Summary Judgment. (Doc. 25.) Esurance seeks declarations that (1) the auto insurance policy it issued to Francis Salazar did not provide coverage for a November 20, 2020 collision and (2) Esurance did not breach any duties that would support Defendants' bad-faith claims against Esurance. (*Id.* at 1–2.) Defendants Ronisha Antone, Edwardine Leyvas, Crystal Leyvas, Mariah Leyvas, and Anthony Leyvas III[1] oppose the motion, arguing there are questions for the trier of fact as to whether Esurance is liable in bad faith. (Doc. 26 at 2.) The motion is fully briefed. (Docs. 25, 26, 32, 33, 34.) For the reasons that follow, the Court will grant Esurance's Motion for Summary Judgment and enter judgment in favor of Esurance on Defendants' bad faith counterclaim.

//

//

---

[1] Defendant Amanda Corella appeared in this action on behalf of her son, Defendant Anthony Leyvas III. Because Anthony Leyvas III has reached the age of majority, the Court will dismiss Amanda Corella.

## I. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Co.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., the fact might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968), however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all justifiable inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

//

//

## II. <u>Undisputed Facts</u>

On November 20, 2020, Francisca Salazar was driving a 2013 Chrysler 200 in Tucson, Arizona. (PSOF ¶ 3, DSOF ¶ 3.)[2] As she started to make a left turn at an intersection, Salazar was struck by a pickup truck driven at a high rate of speed by Carlos Montejano ("the Collision"). (PSOF ¶ 3, DSOF ¶¶ 55–56.) After the Collision, Montejano's truck spun and crashed into a nearby bus stop where two adults and two children were waiting for a bus. The impact of the truck resulted in injuries to Defendants Ronisha Antone and Xavier Leyvas and the deaths of Xander and Anthony Leyvas, Jr. (DSOF ¶¶ 55–56.)

At the time of the Collision, Salazar had an automobile insurance policy through Esurance ("the Policy"). (PSOF ¶ 1, DSOF ¶ 1.) The Policy provided coverage for three vehicles, none of which was the Chrysler 200 that Salazar was driving. (PSOF ¶¶ 2, 7; DSOF ¶¶ 2, 7.)[3] Subject to exclusions, the Policy required Esurance to pay damages for "bodily injury" for which Salazar as an "insured" became legally responsible because of an auto "accident." (PSOF ¶ 11, DSOF ¶ 11.) The Policy had bodily-injury liability limits of $25,000 per person and $50,000 per accident. (PSOF ¶ 2, DSOF ¶ 2.)

The Policy listed exclusions to coverage in the section entitled "EXCLUSIONS FOR PART I: LIABILITY COVERAGE." (PSOF Ex. B at 24, DSOF Ex. 1 at 20.)[4] The Policy stated: "Read carefully. If any of the exclusions below apply, coverage will not be afforded under Part I." *Id*. Exclusion 2.B. excluded coverage for

---

[2] The relevant facts are taken from the parties' statements of fact. Plaintiff's Statement of Facts ("PSOF") is found at Doc. 26. Defendant's Statement of Facts ("DSOF") is found at Doc. 33.

[3] Salazar, and the Chrysler, had previously been insured through GEICO and then Alpha Casualty, but both policies had lapsed. (PSOF ¶ 6, DSOF ¶ 6.) GEICO provided coverage until March 11, 2020. (*Id.*) Alpha Casualty provided coverage from March 18 to September 18, 2020. (*Id.*)

[4] Record citations refer to the page numbers generated by the Court's CM/ECF filing system.

> Any vehicle, other than a "covered auto", which is: 1. "Owned" by "you"; or 2. Furnished or available for "your" regular use.

*Id.* A second exclusion, Exclusion 2.C., excluded coverage for

> Any vehicle, other than a "covered auto", which is: 1. "Owned" by any "family member"; or 2. Furnished or available for the regular use of any "family member".

*Id.* An exception to the 2.C. exclusion provided:

> This Exclusion 2.C. does not apply to "you" while "you" are maintaining or "occupying" any vehicle which is: 1. "Owned" by any "family member"; or 2. Furnished or available for the regular use of any "family member".

*Id.*

The Policy defined "covered auto" as "[a]ny vehicle in 'your' Declarations page" or "[a] 'newly acquired auto.'" (PSOF Ex. B at 21, DSOF Ex. 1 at 17 (other definitions omitted).) It defined "family member" as "any person related to 'you' by blood, or adoption who is a resident of 'your' household." *Id.* It defined "own" or "owner" of a motor vehicle as

> A. Titled to that person under motor vehicle laws;
> B. Leased under a written agreement for a continuous period of at least 6 months; or
> C. That person has primary legal possession, subject to a lien or written security agreement with an original term of six months or more.

(PSOF ¶ 14, DSOF ¶ 14.)

The Policy included a standard cooperation clause, which stated the insured must "Cooperate with 'us' in the investigation, settlement, and defense of any claim or suit." (PSOF Ex. B at 25, DSOF Ex. 1 at 25.) The Policy provided that Esurance's duty to defend "ends when 'our' limit of liability is exhausted by payment of judgments or settlements, or the limit is paid into a court that has jurisdiction." (PSOF ¶ 50, DSOF ¶ 50.)

Salazar did not contact Esurance to report the Collision. (PSOF ¶ 5, DSOF ¶ 63.) On December 30, 2020, Esurance was notified of the Collision by the pickup driver's insurer. (PSOF ¶ 4, DSOF ¶ 4.) Esurance was able to determine that Salazar had never

listed the Chrysler on her Esurance Policy. (PSOF ¶ 7, DSOF ¶ 7.) Esurance emailed Salazar a standard Evidence of Coverage letter the same day. (PSOF Ex. A ¶ 11, DSOF Ex. 2 at 85.)

On December 31, 2020, Esurance assigned the claim to senior claims specialist Charlton Leasure, who emailed Salazar to confirm her attorney's information. (PSOF ¶ 9, DSOF ¶ 9, DSOF Ex. 2 at 70.) Leasure learned from a database search that the Chrysler was registered to Yesenia Salazar, who listed the same home address as Francisca. (PSOF ¶ 10, DSOF ¶ 10.) Leasure would later learn that Francisca Salazar is Yesenia Salazar's mother. *Id.*

On January 4, 2021, Leasure retained CoventBridge, a third-party investigation company, to perform a liability and coverage investigation, which included taking a statement from Salazar. (PSOF ¶ 17, DSOF ¶ 17.) On January 12, 2021, the CoventBridge investigator, Monica Medina, contacted Salazar's attorney and learned Salazar was no longer represented and could be contacted directly. (PSOF ¶ 18, DSOF ¶ 18.) Between December 20, 2020[5] and February 2021, Esurance and Medina made various efforts to contact Salazar by mail, email, text messages, and phone calls to get information from her related to the Collision and issues of coverage for her use of the Chrysler. (PSOF ¶ 19, DSOF ¶ 19.) The only response Medina reported was a call on January 16, 2021, from Salazar's daughter, Aurora, who initially agreed to make her mother available for a statement the next day at her house, but later cancelled, stating that her sister would not allow their mother to give a statement. (PSOF ¶ 21, DSOF ¶ 21.) Esurance mailed Salazar a reservation of rights letter on January 25. (PSOF ¶ 19, DSOF ¶ 19.)

On February 12, 2021, Defendants' counsel, Mick Levin, sent a Time Limited Demand Letter ("Demand Letter"), which Esurance reviewed on February 15. (PSOF ¶ 24, DSOF ¶ 24, DSOF Ex. 3.) The Demand Letter stated that Levin represented all but one of the wrongful death claimants and that his clients would be willing to release their claims if

---

[5] Esurance became aware of the Collision on December 30, 2020. It appears that the December 20, 2020 date may be a typographical error.

- 5 -

their demands were met by March 3, 2021. (PSOF ¶ 26, DSOF ¶ 26.) Levin stated that he did not represent Edwardine Leyvas, the mother of victim Anthony Leyvas Jr., and could not provide a release of any kind for her claims. *Id.* Levin outlined two avenues of avoiding suit: (1) pay the Policy limit to Levin's trust account, provide a copy of the declarations page of the Policy, and provide an affidavit from Salazar stating that she had no other insurance; or (2) interplead the Policy limits and name his clients and their healthcare lienholders as claimants. (PSOF ¶ 25, DSOF ¶ 25.) Levin stated he would file suit on March 4, if Esurance did not complete either option. (PSOF ¶ 26, DSOF ¶ 26.)

On February 18, Leasure referred the claims to outside coverage counsel, who was not able to review the file and meet with Leasure until March 1. (PSOF ¶ 27, DSOF ¶ 27.) On that same date, Leasure discovered that Yesenia Salazar had an auto policy through Progressive Insurance, and that the address she listed for that policy was different than her mother's address. (PSOF ¶ 23, DSOF ¶ 23.)

On February 24, Leasure called Levin's office to seek an extension of the deadline, but Levin was not able to speak with Leasure until March 1. (PSOF ¶ 29, DSOF ¶ 29.)

On March 1, Leasure spoke with Levin and requested an extension of the demand deadline, explaining Esurance's difficulties in obtaining a statement from Salazar and its doubts about her coverage. (PSOF ¶ 30, DSOF ¶¶ 30, 87.) Levin declined to provide an extension because his clients did not authorize it. (PSOF ¶ 31, DSOF ¶¶ 31, 87.) On March 1, Leasure also discussed the coverage issues, including the exclusions with coverage counsel. (DSOF ¶ 86.)

On March 2, Esurance retained Jones, Skelton & Hochuli ("JS&H") to respond to the demand letter. (PSOF ¶ 32, DSOF ¶¶ 32, 88.) JS&H communicated to Esurance their concerns about Edwardine Leyvas' claim persisting should Esurance not include her in the settlement. (PSOF ¶ 33, DSOF ¶ 33.) That day, JS&H emailed Levin seeking an extension, pointing out Edwardine's potential claim, and affirming their commitment to "finalizing a settlement or interpleading the policy limits." (PSOF ¶ 34, PSOF Ex. I; DSOF ¶ 34.)

On March 3, the day of the deadline, JS&H reported to Leasure that Levin had not

- 6 -

responded to the extension request and that filing an interpleader would be the most expedient way to proceed if Esurance decided to tender the Policy limits. (PSOF ¶ 35, DSOF ¶ 35.) On March 3, 2021, JS&H told Leasure that JS&H would not be able to meet the time limit even if Esurance had given authority to offer the policy limits. (DSOF ¶ 90.) That same afternoon, Leasure sent Levin a letter that globally tendered the Policy limits, but did not provide the "no other insurance" affidavit or the copy of the declarations page. (PSOF ¶ 36, DSOF ¶ 36.)

On March 4, Defendants filed a wrongful death action in the Pima County Superior Court, No. C20211034. (PSOF ¶ 40, DSOF ¶ 40.) Levin emailed Esurance's counsel explaining that he filed suit because Esurance did not fully accept either of the two options provided in the Demand Letter. (PSOF ¶ 38, DSOF ¶ 38.) He further explained that his clients refused to grant any extension due to familial losses and unpaid bills. *Id.* The next day, Levin informed Esurance's counsel that he would seek to enter a *Peaton* agreement with Salazar. (PSOF ¶ 39, DSOF ¶ 39.)

On March 12, Esurance interpleaded the Policy limits with the Pima County Superior Court. (PSOF ¶ 42, DSOF ¶ 42.)

On March 29, Salazar finally gave a statement to CoventBridge via telephone. (PSOF ¶ 44, PSOF Ex. L; DSOF ¶ 44.) Salazar admitted that Yesenia gave the Chrysler to Salazar years earlier but had never transferred the title; Salazar was the usual driver of the Chrysler; and Yesenia had not lived with Salazar for two years. (PSOF ¶ 45, DSOF ¶ 45.)

In May 2021, Esurance retained Michael Rossi to defend Salazar in the wrongful-death action under a reservation of rights. (PSOF ¶ 43, DSOF ¶ 43.) Rossi filed an answer to the March 4 complaint and defended Salazar until after the interpleader was resolved in June 2022. *Id.* During Rossi's representation, Levin proposed Salazar enter into a *Morris* agreement[6] with his clients. (PSOF ¶ 51.) Such an agreement would protect Salazar from

---

[6] A *Morris* agreement allows an insured who is defended under a reservation of rights to agree to the entry of judgment against the insured, assign any bad faith claims against the insured's insurer to the claimants, and escape personal liability without breaching the cooperation clause. *See United Servs. Auto. Ass'n v. Morris*, 741 P.2d 246, 252 (Ariz.

- 7 -

any personal liability for damages. (*Id.*) Rossi, based on his discussions with Levin, thought the case would settle and so the parties only exchanged initial disclosures and scheduling orders. (PSOF ¶ 52.)[7]

The interpleader action was resolved in June 2022, and Defendants received the Policy limits. (PSOF ¶¶ 43, 47; DSOF ¶¶ 43, 47.)

On July 14, 2022, Esurance filed a declaratory judgment action in the Pima County Superior Court seeking a ruling that released it from providing Salazar's defense because she was not covered under the Policy. (PSOF ¶ 53.) This did not affect Salazar's defense in the Superior Court case and only accelerated her entry into a *Morris* agreement with Defendants. (PSOF ¶ 54, DSOF ¶ 54.)

On September 26, 2022, Salazar and Defendants signed the *Morris* Agreement. (PSOF ¶ 48, DSOF ¶ 48.) In the agreement, Salazar assigned to Defendants her bad faith claims against Esurance, agreed to entry of monetary judgment against herself, and obtained a covenant that Defendants not execute the judgment against Salazar, thereby shielding herself from personal liability. (PSOF ¶ 51, PSOF Ex. M ¶¶ 4–6, 13; DSOF ¶ 51.)

Esurance filed the pending declaratory relief action in this Court on August 24, 2023. (Doc. 1.) Esurance seeks judgment declaring that: (1) the auto insurance policy issued by Esurance to Salazar did not provide coverage for the Collision; (2) Esurance could not have breached any duties that would support bad faith claims against it; (3) Esurance did not act in bad faith in filing the state court declaratory judgment action; (4) Esurance did not breach any duty of equal consideration owed to Salazar; (5) Defendant

---

1987); *Parking Concepts, Inc. v. Tenney*, 83 P.3d 19, 22 (Ariz. 2004). If the insurer is found to have not acted in bad faith, the agreement "will be a breach of the cooperation clause and the insurer will be excused from any duty to pay the stipulated judgment, no matter how reasonable the amount." *Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1024 (Ariz. 2005).

[7] Defendants do not dispute the facts contained in PSOF ¶¶ 51 and 52, but object on relevance grounds. (DSOF ¶¶ 51, 52.) The Court concludes the facts are undisputed and relevant to understanding the course of events.

Edwardine Leyvas has no valid assigned claim against Esurance; and (6) Defendants have no legal basis to support their counterclaim for bad faith. (Doc. 25 at 1–2.) Defendants counterclaimed, alleging that Esurance acted in bad faith and put its own interests ahead of Salazar's by failing to accept Defendants' settlement offer in a timely manner, and exposing Salazar to a judgment far in excess of her ability to pay.[8] (Doc. 10 ¶¶ 97–99.) Esurance seeks summary judgment on all claims.

### III. Legal Framework

Arizona recognizes an insurer's duty to give equal consideration to settlement offers as part of the implied duty of good faith and fair dealing. *Clearwater v. State Farm Mut. Auto. Ins. Co.*, 792 P.2d 719, 722 (Ariz. 1990). The duty of equal consideration demands that an insurer presented with a settlement offer, not act with partiality towards itself. *Safeway*, 106 P.3d at 1024 (citing *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme*, 735 P.2d 451, 459 (Ariz. 1987)). An insurer, in charge of the insured's defense, "typically has exclusive authority to accept or reject offers of settlement" via an insurance contract's cooperation clause. *Clearwater*, 792 P.2d at 722. When an insurer defends an insured but reserves the right to contest coverage it puts the insured in a "precarious position." *Morris*, 741 P.2d at 251–52. The insurer gets two chances to escape liability at the expense of the insured, one at trial with the claimant(s) and then again when litigating coverage. *Id.* at 251. The insured, meanwhile, bares the financial risk of a finding of noncoverage or any judgment in excess of the policy limits while not being able to control settlement discussions without breaching the insurance contract's cooperation clause. *Id.*

Insurers who allow time limited settlement offers to expire do not necessarily act in

---

[8] Defendants also asserted as a basis for their bad faith claim that Esurance initiated the state declaratory judgment action while Defendants' claims against Salazar were still pending. Plaintiff addressed this theory in its motion for summary judgment. (*See* Doc. 10 ¶¶ 97–99.) Defendants abandoned the theory by failing to provide legal arguments in their response brief. *See State v. Bolton*, 896 P.2d 830, 838 (Ariz. 1995) (finding that failure to argue an issue in the body of the brief waives the argument). Moreover, Defendants admitted that the filing of the action did not affect Salazar's defense in the state court case and only accelerated her entry into a *Morris* agreement with Defendants. (DSOF ¶ 54.)

bad faith. *Miel v. State Farm Mut. Auto. Ins. Co.*, 912 P.2d 1333, 1339 (Ariz. App. 1995). The good faith of an insurer's actions is evaluated by how it reached its conclusion based on the information available to it at the time it failed to accept the settlement offer. *Gen. Accident Fire & Life Assur. Corp. v. Little*, 443 P.2d 690, 695 (Ariz. 1968). "Mere negligence or inadvertence is not sufficient—the insurer must intend the act or omission and must form that intent without reasonable or fairly debatable grounds." *Rawlings v. Apodaca*, 726 P.2d 565, 576 (Ariz. 1986). An insurer is liable in bath faith when it lacks a founded belief that its conduct was permitted by the policy. *Id.* A "founded belief is absent when the insurer either knows that its position is groundless or when it fails to undertake an investigation adequate to determine whether its position is tenable." *Id.*

"While the obligation of good faith does not require the insurer to relieve the insured of all possible harm that may come from his choice of policy limits, it does obligate the insurer not to take advantage of the unequal positions in order to become a second source of injury to the insured." *Id.* at 573 (citing *Little*, 443 P.2d at 697). "As long as [an insurer] acts honestly, on adequate information and does not place paramount importance on its own interests, it should not be held liable because of a good faith mistake in performance or judgment." *Id.*

**IV.    Discussion**

The Court concludes that Esurance is not liable in bath faith because it had a founded belief that its conduct was permitted by the Policy and undertook, without undue delay, an investigation adequate to determine whether that position was tenable.

**A. Salazar Was Not Covered Under the Policy**

Insurance contracts are interpreted according to their plain and ordinary meaning. *Teufel v. Am. Fam. Mut. Ins. Co.*, 419 P.3d 546, 548 (Ariz. 2018). Here, the Policy provided, "If *any* of the exclusions . . . . apply, coverage will not be afforded under Part I." (PSOF Ex. B at 24, DSOF Ex. 1 at 20.) Two exclusions applied.  First, in exclusion 2.B., the Policy plainly excluded coverage for:

> Any vehicle, other than a "covered auto", which is: 1. "Owned" by "you"; or 2. Furnished or available for "your" regular use.

Exclusion 2.B. excluded coverage in two ways. Exclusion 2.B. applied because the Chrysler 200 was not a "covered auto"—an auto that was listed in the Policy's Declarations page or newly acquired. Salazar did not list the Chrysler 200 on her Esurance Policy, and the Chrysler 200 was not newly acquired. Exclusion 2.B. also applied because the Chrysler 200 was available for Salazar's regular use; Yesenia, Salazar's daughter, had made the vehicle available for Salazar's regular use for two years.

Exclusion 2.C. also applied to exclude coverage. Exclusion 2.C. excluded coverage for "[a]ny vehicle, other than a 'covered auto'", which is "'[o]wned' by any 'family member'." The Chrysler 200 was not a "covered auto" because it was not listed in Salazar's Declarations page or newly acquired and because Yesenia was the title owner of the vehicle. An exception to the 2.C. Exclusion allowed for coverage if the insured was occupying a vehicle that is "A. 'Owned' by any 'family member'." But the Policy, defined "family member" as a blood relative of the insured "who is a resident of 'your' household." (PSOF ¶ 4, DSOF ¶ 4.) Yesenia, who was the registered owner of the Chrysler, was not a "family member" as that term was defined in the Policy because Yesenia did not reside with Salazar. Thus, the exception to Exclusion 2.C did not apply and Exclusion 2.C excluded coverage.[9]

### B. The Appearance of Coverage

Defendants argue that coverage under the Policy is not relevant to the determination of whether there was bad faith because Esurance did not know whether Salazar was covered

---

[9] The Court finds unpersuasive Defendants' argument that Esurance waived its coverage defense when it tendered the Policy limit and filed an interpleader action for the Policy limits without reservation. (Doc. 32 at 11–12.) Defendants rely on *Penn-America Ins. Co. v. Sanchez*, 202 P.3d 472 (Ariz. App. 2008), for the proposition that insurers may be estopped from denying coverage by an unreasonable delay in issuing a reservation of rights. In *Penn-America*, the insurer unequivocally defended the insured for ten months before issuing a reservation of rights. *Id.* at 479–80. Here, Esurance mailed Salazar a reservation of rights letter on January 25, 2021, early in the investigation and well before the wrongful death suit had commenced. Esurance's conduct does not demonstrate an intent to waive the right to contest coverage; Esurance never rescinded the reservation of rights letter or communicated to Salazar that she was covered.

under the Policy at the time of the Demand Letter and, by failing to fully accept either option laid out in the Demand Letter, Esurance breached the duty to equally consider settlement offers. (Doc. 32 at 11.) Defendants assert that it would have fairly appeared to Esurance, at the time the offer expired, that the Collision was covered because Esurance did not know that Yesenia did not live with Salazar, and thus, the exception to Exclusion C.2. would have applied. (*See id.*) According to Defendants, "While Esurance later learned information from which it could conclude that Yesenia was not a 'family member', that information came too late to be useful in responding to the Demand Letter." (*Id.*)

It is true that Esurance's conduct is evaluated based on the case as it fairly appeared to Esurance at the time of the actions in question. *See Acosta v. Phoenix Indem. Ins. Co.*, 153 P.3d 401, 404 (Ariz. App. 2007). But here, the undisputed facts demonstrate that, before the settlement offer expired on March 3, 2021, Esurance had a founded basis for its belief that the Policy did not provide coverage for the Collision and had undertaken an investigation adequate to determine the reasonableness of its position. As early as December 2020, it would have fairly appeared to Esurance that coverage was excluded under Exclusion 2.B. because the Chrysler 200 was not a "covered auto"—an auto that was listed on the Policy or newly acquired. On December 30, 2020, Esurance was notified of the Collision by the pickup driver's insurer, and, on that same date, determined that Salazar had never listed the Chrysler on her Esurance Policy. Esurance also learned that the Chrysler was registered to Yesenia Salazar.

By February 18, 2021, Esurance would have had a reasonable basis for concluding Exclusion 2.C. applied. By then, Esurance learned that Yesenia Salazar had an auto policy through Progressive Insurance and the address she listed for that policy was different than her mother's address. Thus, before the expiration of the deadline included in the Demand Letter, it would have fairly appeared to Esurance that coverage was excluded without exception under Exclusion 2.C., because the vehicle was not a "covered auto": the vehicle was titled to Salazar's daughter Yesenia and Yesenia did not live at Salazar's residence.
//

### C. Refusal to Settle

Defendants have failed to allege any actions taken by Esurance that amount to bad faith. There is "no authority for the [Defendants'] theory that failing to accept a settlement offer by the specific means set out by the injured party results in a breach of the insurer's good faith duties to consider the insured's interests when evaluating settlement offers." *Cornerstone Nat. Ins. Co. v. Itule*, No. CV-13-00292-PHX-GMS, 2014 WL 4897364, at *6 (D. Ariz. Sept. 30, 2014)*; see also Miel*, 912 P.2d at 1339 (concluding an insurer who allows a time limited settlement offer to expire does not necessarily act in bad faith). In the *Itule* decision, which is factually similar to the present case, the court held, as a matter of law, that the insurer's failure to accept a time-limited settlement offer by specific means did not result in a breach of equal consideration where no facts suggested the delay jeopardized the insured. *Id*. There, the insurer was presented with a time-limited demand letter that requested an affidavit of the insured's assets and checks for the policy limits. *Id*. at *1. Three days before the deadline, the insurer requested an extension but received no response from claimant's counsel. *Id*. On the day of the deadline, the insurer offered to pay the policy limit, but did not send a check or the asset affidavit. *Id*. The next day, the insurer sent a check for the policy limit, but claimant's counsel declined to accept it and filed suit. *Id*. The insurer hired defense counsel for its insured, then interpleaded its policy limit with the court within 90 days. *Id*. On these facts, the court concluded there is no dispute the insured attempted to settle the claims, offering the full amount of the policy. *Id*. at *5.

Here, as in *Itule*, Esurance never offered to pay anything less than its Policy limits. It only failed to accept the settlement demand in the prescribed form. Before the March 3 Demand Deadline, Esurance requested, on February 24, an extension of the deadline. Esurance articulated its concerns about Salazar's coverage and the survival of Edwardine's claim were it to accept the settlement.[10] Defendants' counsel denied the request on March

---

[10] Defendants suggest Esurance is disingenuous in being concerned whether Levin's clients would share any of the Policy limits with potential-plaintiff Edwardine Leyvas. (Doc. 32 at 15.) According to Defendants, Esurance knew or should have known that there is only one plaintiff in a wrongful death action and the plaintiff owes a fiduciary duty to all

- 13 -

1. On March 2, Esurance's counsel sent an email requesting an extension of the deadline and communicated Esurance's commitment to finalizing a settlement or interpleading the policy limits. On March 3, Esurance's counsel informed Esurance that Defendants' counsel had not responded to the request. On that same day, the deadline, Esurance sent Defendants' counsel a letter that globally tendered the Policy limits. Although Esurance did not provide the affidavit of no other insurance or the declarations page with its tender, Esurance communicated that it would seek to finalize the settlement. Defendants filed suit on March 4. On March 12, 2020, Esurance interpleaded the Policy limits in state court. Esurance's actions do not demonstrate the intent or reckless disregard necessary for bad faith. *See State Farm Mut. Auto. Ins. Co. v. Peaton*, 812 P.2d 1002, 1010 (Ariz. App. 1990); *Miel*, 912 P.2d at 1339.

Defendants argue that Esurance's attempted acceptance was not satisfactory because they would not have been able to "determine whether they in fact had been tendered the policy limit and whether there was in fact no other insurance available." (Doc. 32 at 13.) But Esurance could not have provided the affidavit of no other insurance because Salazar refused to cooperate with it and Edwardine Leyvas's potential claim was still at issue. Whether satisfactory to Defendants, or not, Esurance's actions were not unreasonable and, most importantly, Esurance did not jeopardize Salazar. Here, like the claimants in *Itule*, Defendants refused to negotiate with Esurance to finalize a settlement. Defendants' counsel did not respond to Esurance's tender letter, and instead rejected this counteroffer by filing suit immediately.[11]

---

other beneficiaries—including Edwardine Leyvas. (*Id.*) However, in the Demand Letter, Defendants' counsel specifically noted they would not provide release from Edwardine's claim, and Defendants' position all along was that the terms of the Demand Letter were not negotiable. Therefore, Edwardine never made Esurance an offer to settle before litigation began, and she has no valid assigned claim. *See Wilmot v. Wilmot*, 58 P.3d 507, 512 (Ariz. 2002) (a statutory plaintiff must have express consent of surviving claimants to settle a wrongful death claim).

[11] Defendants assert numerous facts support its claim that Esurance did not act prudently in responding to the Defendants' Demand. For example, Defendants argue Esurance did

- 14 -

Defendants' bad faith claim essentially is premised on Esurance's failure to comply with all of the terms of Defendants' Demand Letter. On the undisputed facts of this case, such failure does not demonstrate that Esurance put paramount importance on its own interests. No reasonable juror could conclude that Esurance's actions constitute bad faith under Arizona law.

## V.     Conclusion

For the foregoing reasons, the Court concludes Plaintiff Esurance is entitled to a declaratory judgment and entry of judgment in its favor and against Defendants on their counterclaim. The Court concludes that the auto insurance policy Esurance issued to Francisca Salazar did not provide coverage for the November 20, 2020 collision and Esurance did not breach any duties that would support Defendants' bad-faith claim.

Accordingly,

//
//
//
//
//

---

not attempt to induce Salazar to contribute to a settlement and failed to follow its own attorney's advice to file the interpleader action as soon as possible. (Doc. 32 at 14.) But Salazar was not responding to Esurance and Esurance filed the interpleader action within eight days of the Demand Letter deadline, after having tendered the Policy limits. Defendants argue that Esurance did not make "numerous attempts" to contact Salazar and fault the claims specialist for sending only two letters, instead of picking up the phone and attempting to call her. (*Id.*) But Defendants acknowledge that Esurance hired a third party investigation company for this purpose, even though they also fault that company for its lack of success. (*Id*.) It is undisputed, however, that the claims adjustor and the investigation company made efforts to contact Salazar by mail, email, text messages and phone calls, and, on January 16, it became clear that Salazar was refusing to talk to Esurance. Defendants also assert that the claims adjustor did not do enough or act fast enough in responding to the Demand Letter. (*Id.*) The Letter was reviewed on February 15. By the March 3 deadline, Esurance globally tendered the Policy limits, and eight days later interpleaded the Policy limits. The numerous facts identified by Defendants are insufficient, by themselves or in combination, to show Esurance failed to act prudently.

**IT IS ORDERED:**

1. Amanda Corella is dismissed as a party.

2. Plaintiff Esurance's Motion for Summary Judgment (Doc. 25) is **granted**.

3. The Clerk must enter judgment in favor of Esurance and against Defendants on their counterclaim and close this case.

Dated this 24th day of March, 2025.

_____
Jennifer G. Zipps
Chief United States District Judge